HASKINS (UNITED STATES v.). See Case No. 15,322.

## Case No. 6,197.

HASLETT et al. v. The ENTERPRISE.

[19 Int. Rev. Rec. 108.]

District Court, D. New Jersey. 1874.

ADMIRALTY—JURISDICTION—MARITIME LIENS— WORK AND MATERIALS.

1. A barge without mast, bowsprit, rudder, sails, or any other propelling power, used as a mere transport in the harbor of New York, and owned by residents of Jersey City, was brought to the latter place for repairs. The owners failing to pay for the necessary work and materials, a proceeding in rem. was instituted against the craft, at her domestic port, in which it was claimed that a maritime lien existed for the work done and materials furnished. *Held*, that since the change of the twelfth rule in admiralty (May 6, 1872), where a lien upon a vessel is given by the local law of the state, a proceeding in rem. may be used in the admiralty court, to enforce it.

2. Whether, since the abrogation of the said rule prohibiting it, such a proceeding will lie, where there is no local law recognizing the lien, quaere?

3. The said barge being a vessel engaged in a maritime service upon navigable waters, was subject to the lien.

[This was a libel in rem by Henry Haslett and Henry Foster, partners, etc., against the barge Enterprise, etc., for repairs.]

Mr. Wortendyke, for libellants.

Mr. Ransom, for claimants.

NIXON, District Judge. This is a libel filed against the barge Enterprise, etc., for necessary materials furnished and work and labor performed by the libellants in repairing the barge in her home port. The claimant intervenes as owner, acknowledges the furnishing of materials and doing repairs by libellants, but claims that the libel should be dismissed upon two grounds. (1) Because no maritime lien exists on the barge for the said materials, work and labor, the materials having been furnished and the work and labor done and performed in Jersey City, the home port where the libellants and respondent reside. (2) Because the barge is not a sea-going vessel, having no masts, bowsprit, sails, rudder, or any other propelling or directing power.

1. The present unsettled state of the law in this country as to the right of material men for a lien upon domestic ships for materials furnished and labor performed has, doubtless, arisen from the disposition of the supreme court at the outset to recognize the restrictions upon admiralty jurisdiction which grew up in England on account of the jealousy and unreasonable prejudice of the courts of the common law against the courts of admiralty.

The civil law, the general maritime law, and the particular maritime codes of the continent of Europe, do not seem to have made any distinction between foreign and domestic vessels, but have always extended the lien upon both for labor performed and materials furnished for repairs. 3 Kent, Comm. 168; Ben. Adm. §§ 271, 272. Such also was the practice of the English admiralty until the times of Charles II., when the courts of common law, continuing their interference by prohibitions to the admiralty, and impregnated with the common law notion that there could be no lien where there was no possession, decided that material men and mechanics furnishing repairs, had no particular lien upon the ship itself for the recovery of their demands; and this limitation to the jurisdiction of the English admiralty substantially continued until the adoption of the federal constitution in 1789. The constitution of the United States (article 3, § 2) declares that "the judicial power shall extend to all cases . . . . of admiralty and maritime jurisdiction." The judiciary act of 1789 [1 Stat. 73] established the district courts of the United States, and granted to them "exclusive original cognizance of all cases of admiralty and maritime jurisdiction," allotting to this court exclusive admiralty jurisdiction in the words of the constitution.

A difference of views, leading to diverse action, for some time existed in the subordinate courts of the United States and among the judges upon the question whether this jurisdiction should be exercised by the district court according to the principles and practice of courts of admiralty in commercial nations generally, or whether it was limited and interpreted by the cases of admiralty jurisdiction in England when our constitution was adopted. In De Lovio v. Boit [Case No. 3,776], Mr. Story, in an opinion indicating a profound investigation of the subject, contended for the general jurisdiction, while Chancellor Kent, in 1 Comm. 377, expressed a doubt whether the framers of the constitution intended to confer upon the admiralty court anything more than that limited jurisdiction which was settled and in practice under the English jurisprudence

when the constitution was made. To the same effect was the judgment of Mr. Justice Baldwin in Bains v. The James and Catherine [Case No. 756]. But the question has now been settled by the supreme court. In a line of decisions beginning in 1847, with a divided court, in Waring v. Clark, 5 How. [46 U. S.] 441, and ending in 1870, with an unanimous opinion, in Insurance Co. v. Dunham, 11 Wall. [78 U. S.] 1, we have a series of judgments affirming the doctrine that the admiralty and maritime jurisdiction of the United States is not to be limited by the statutes or judicial prohibitions of England, but that it extends, as to the locus or territory not only to the main sea, but to all the navigable waters of the United States, or bordering on the same, whether "landlocked or open, salt or fresh tide, or no tide;" and that as to contracts, the true criterion is their nature and subject matter, without regard to the place where they are made. The general jurisdiction of the admiralty courts of the United States being thus established it would seem to be necessary in any given case only to inquire, not where did the contract arise, in reference to the residence of the owner, but what is its nature? Does it pertain to navigation? Is it maritime as to its subject matter? And if these questions are answered in the affirmative, then it is a case of admiralty and maritime jurisdiction, and, as such, is only cognizable in the admiralty courts of the United States. The Moses Taylor, 4 Wall. [71 U. S.] 411; The Hine v. Trevor, Id. 555; The Belfast, 7 Wall. [74 U. S.] 624.

Although the supreme court has reached the result that the jurisdiction in admiralty is not to be restricted by the statutes and prohibitions that limited the English admiralty, yet, in the consideration of particular cases, it has shown an indisposition to include within the jurisdiction of the American admiralty many subjects which have always been regarded as maritime in their character by the civil law, and the recognized maritime codes of the commercial world. For instance, it was decided in People's Ferry Co. v. Beers, 20 How. [61 U. S.] 393, that the building of a ship was not a maritime contract; and that the admiralty courts of the United States had no authority to enforce a lien claimed by the builder for materials furnished and work done in its construction. The doctrine of this case was re-affirmed in Roach v. Chapman, 22 How. [63 U. S.] 129, and extended to the engine and boilers furnished to a new steamer. Mr. Justice Grier, in delivering the opinion of the court, says, "A contract for building a ship or supplying engines, timber or other materials for her construction, is clearly not a maritime contract." It is, doubtless, the duty of the subordinate courts of the United States to accept these decisions as the law of the American admiralty. They accord with the English doctrine on the subject; but are directly op-

posed to the maritime codes of other nations, which not only regard the building of a ship as a maritime contract, but give a lien to the builder, for work done and materials furnished. Ben. Adm. § 264. Whether they are reconcilable with what was said by the same court, in the more recent case of Insurance Co. v. Dunham, supra, to wit, (1) that the admiralty and maritime jurisdiction of the United States is not to be limited by the restrictions imposed upon the English admiralty, but is to be interpreted by a more enlarged view of its essential nature and objects, and with reference to analogous jurisdiction, in other countries, constituting the maritime commercial world as well as to that of England; and (2) that the English rule, which concedes jurisdiction, with a few exceptions, only to contracts made upon the sea and to be executed thereon—making locality the test—is entirely inadmissible; and that the true criterion is the nature and subject matter of the contract, as whether it was a maritime contract, having reference to maritime service and maritime transactions—it must be left to that high tribunal to consider and decide.

Again, as we have before stated, the civil law and the maritime codes of these countries, which have adopted its principles, give a lien or privilege upon the vessel to the person who furnishes repairs or performs labor, upon her, whether abroad or at home. Such jurisdiction has for many years been prohibited to the English admiralty—a lien there being allowed only for repairs and necessaries, when the ship is abroad. Watkinson v. Bernadiston, 2 P. Wms. 367; Buxton v. Snee, 1 Ves. Sr. 154. The supreme court has already held that in either case the contract was maritime and therefore within the jurisdiction of the admiralty courts; but, adopting the English rule, no lien has been recognized in favor of material men and mechanics, who furnish repairs and perform labor upon the ship in her home port, unless a lien has been given by the local law. Admiralty jurisdiction existing in a large class of cases, wholly independent of the doctrine of liens, it decided in the case of The General Smith, 4 Wheat. [17 U. S.] 438, that the general maritime law, following the civil law, established a specific lien upon a foreign ship, for repairs and necessaries, which might be enforced by proceedings in rem.; but no particular lien being given upon domestic ships for like services, in such a case a suit in personam only was maintainable, unless it appeared that the municipal law of the state where the ship belonged and the services were rendered, gave or recognized a lien.

Perhaps no decision of a case in any court, has awakened more comment and criticism, than the case of The General Smith [supra.] It was an effort to compromise the long standing feud, and contest for jurisdiction, between the common law and admiralty courts, and, like most attempts of the sort,

was distasteful to the advocates on both sides. It was first fiercely attacked, eight years after the decision, by Mr. Justice Johnson, in Ramsey v. Allegre, 12 Wheat. [25 U. S.] 614, because it departed from the English doctrine, in recognizing general admiralty jurisdiction over the contracts of domestic material men for repairs and supplies, and allowed suits in personam, in admiralty, to enforce such contracts. On the other hand, its soundness has been seriously questioned by elementary writers upon admiralty jurisdiction and practice, and by judges, who hold to the more extended jurisdiction of the admiralty courts and repudiate the English doctrine, that no implied lien or preference exists in such cases; and who are not able to understand how the court could consistently hold such contracts to be maritime, and yet deny to the libellant the right to proceed in rem for the recovery of his debt. Ben. Adm. § 272; 5 Am. Law Rev. 604; Francis v. The Harrison [Case No. 5,038.] But the question again came before the court in 1833, in the case of The Planter, 7 Pet. [32 U. S.] 324, on an appeal from the district court of the United States, for the Eastern district of Louisiana [Case No. 11,207]. It was a libel filed against a steamer in her home port, for work done and materials found in her repairs. The libel asserted, that by the admiralty law and the laws of the state of Louisiana, workmen employed in the construction or repairs of a ship or boat, had the privilege of a lien thereon, for the payment of sums due for repairs or materials. The answer of the owners averred, that they were citizens of Louisiana, residing at New Orleans; that the libellants were also citizens, and that the court had no jurisdiction over the case. It was held, on the appeal, that the service performed was a maritime service, and the case was one of admiralty jurisdiction; that the state law gave a lien, which could be enforced in the admiralty by a proceeding in rem; and The General Smith, supra, was quoted and relied upon, as exhibiting the correct principle which governed the case. And subsequently, in 1837, in The Orleans v. Phoebus, 11 Pet. [36 U. S.] 175, Mr. Justice Story, in delivering the opinion of the court, made reference to the foregoing case of The Planter, in order to correct a misapprehension which seemed to exist respecting its scope and purport, and incidentally reaffirmed the general doctrine of the case. He said that that decision authorized the conclusion that courts of admiralty could only enforce these liens of the local or state law which were given upon maritime contracts; that in The Planter the contract was treated as a maritime contract; and the lien, under the state laws, was enforced in the admiralty, upon the ground that the court, under such circumstances, has jurisdiction of the contract as maritime; and then the lien, being attached to it, might be enforced according to the

mode of administering remedies in the admiralty. The local laws can never confer jurisdiction on the courts of the United States. They can only furnish rules to ascertain the rights of parties, and thus assist in the administration of the proper remedies where the jurisdiction is vested by the laws of the United States.

This review of the state of the law in regard to admiralty jurisdiction to this period of time brings us to the consideration of the famous twelfth rule in admiralty, which is supposed to have exerted a large influence upon subsequent adjudications. The sixth section of the act, further supplementary to the Judiciary Act, approved August 23, 1842, (5 Stat. 518), authorizing, inter alia, the supreme court, "from time to time, to prescribe and regulate and alter the forms of writs and other process, to be used and issued in the district or circuit courts of the United States"—that court in 1844 promulgated certain rules for the regulation and government of the practice of said courts, on the instance side, in suits in admiralty, the twelfth rule of which was as follows: "In all suits by material men for supplies or repairs, or other necessaries for a foreign ship or for a ship in a foreign port, the libellant may proceed against the ship and freight in rem., or against the master or the owner alone, in personam. And the like proceeding in rem. shall apply to cases of domestic ships where, by the local law, a lien is given to material men for supplies, repairs, or other necessaries." This rule was doubtless prepared under the foregoing authority to make the process and modes of proceeding in admiralty cases to harmonize with the admiralty jurisdiction of the courts, as the supreme court had determined it. It authorized material men to proceed in rem. against the ship and freight for supplies and repairs to a foreign ship or a ship in a foreign port; and it applied a like proceeding in rem. to cases of domestic ships where the material men had a lien by the local law. The inference to be drawn from the rule undoubtedly is, that there was no lien for materials, repairs, or supplies on a ship in her home port, unless the same existed by the force and operation of the local law. The rule remained unaltered until 1858, and Ch. J. Taney, in The St. Lawrence, 1 Black [66 U. S.] 530, gives the reason for its original adoption, and for its subsequent change. He says it was adopted as a rule of practice to enforce a state lien in the admiralty courts by the ordinary admiralty process; that the state lien, however, was enforced not as a right which the court was bound to carry into execution upon the application of the party, but as a discretionary power which the court might lawfully exercise for the purposes of justice, when it did not involve controversies beyond the limits of admiralty jurisdiction. It was altered because, in many of the states, the laws were found not to harmonize with

the principles and rules of the maritime code; that certain conditions and forms of proceeding were usually required to obtain the lien, which differed in different states; and that, if the process in rem. were used wherever the local laws gave the lien, it subjected the admiralty court to the necessity of examining and expounding the varying lien laws of every state, and of carrying them into execution, which was found to be inconvenient, impracticable, and troublesome.

The rule as amended, and which was to take effect from May 1, 1859, read as follows: "In all suits by material men for supplies or repairs or other necessaries for a foreign ship or for a ship in a foreign port, the libellant may proceed against the ship and freight in rem., or against the master or owner alone in personam. And the like proceeding in personam, but not in rem., shall apply to cases of domestic ships for supplies, repairs, or other necessaries." The change is in the last clause, and consists in expressly applying the proceeding in personam to all cases of domestic ships for supplies or other necessaries, and of expressly denying the proceeding in rem. in like cases, although a lien should be given by the state or local law. When this change was made there was a sentiment prevailing that the grant to the United States, in the constitution, of judicial power in all cases of admiralty and maritime jurisdiction, was not an exclusive grant, but that the states had a concurrent jurisdiction, except when its exercise by them came into conflict with the national legislation on the subject. But since then the cases of The Moses Taylor, The Hine v. Trevor, and The Belfast [supra] have established a different principle, and it seems now the settled doctrine that maritime liens can be enforced by proceeding in rem. only in the district courts of the United States, and that no jurisdiction over them exists in the state courts.

It then became apparent that the twelfth rule, as amended, prohibiting the use of the process in rem. to enforce a maritime lien, in the courts of the United States, was equivalent to denying such a process in every court; and that no matter how clearly the right existed, there was no remedy anywhere for its enforcement. The result was another amendment, or rather the repeal of the rule, and the substitution of the following, in its stead, on the 6th of May, 1872. Admiralty rule 12: "In all suits by material men for supplies or repairs or other necessaries the libellant may proceed against the ship and freight in rem., or against the master or. owner alone, in personam." It will be perceived that the new rule differs from the former rules in two important particulars. It does not distinguish between foreign and domestic vessels, like the preceding amendment, but embraces both in a single class. It makes no mention of a lien given by the local law, as the first rule did, but seems to assume, although it does not assert, that a lien exists in favor of material men by virtue of the general maritime law. See 7 Am. Law Rev. 19. How does this change of the rule affect the whole subject? Does it mean that the court is now prepared to retrace its steps on the question of materials furnished, and repairs made to domestic vessels, and hereafter to give a lien, and consequently, the process in rem., for the collection of these claims? Or does it intend to restore the rule of 1844, in regard to liens created by the local law and apply the proceeding in rem. to domestic ships, in such cases, and to still withhold that remedy for the enforcement of such maritime contracts, in the absence of a local law, giving a lien? Without any exposition of the view of the court, in making the alteration, we are left wholly to conjecture for its motive and intent. We are strongly inclined to hold, that so long as the supreme court adheres to the doctrine that repairs or supplies to a vessel, engaged in maritime commerce, is a maritime contract, cognizable exclusively in the admiralty—the legal consequence of the recent change of the twelfth rule, is to authorize a proceeding in rem., to enforce such a contract, without any limitation upon the right, because the vessel happens to be in her home port, or is engaged in a strictly internal commerce when the service is rendered. But as jurisdiction in the present case can be sustained upon another ground, which is within the authority of the case of The General Smith [supra], and which ought to be accepted as the law in this court until it is overruled by the tribunal that made the decision, we prefer to hold, that by virtue of the first section of the act of the legislature of the state of New Jersey entitled. "An act for the collection of demands against ships, steamboats, and other vessels," approved March 20, 1857 (Nix. Dig. 570), a local lien is given to the libellant for the work done and materials furnished to the vessel attached, and which is enforceable in this court by the proceeding in rem.

2. The second objection to the jurisdiction has reference to the character of the vessel. The libel is filed against the barge Enterprise. The answer of the claimant admits that the barge is of the burthen of about seventy-five tons: and that "she is a boat used by the respondent for being towed about the harbor of New York to transport coal, lumber, or other materials from one point to another in the city of Jersey City and the city of New York;" and the allegation is, that the matters set forth in the libel are not within the admiralty and maritime jurisdiction of the United States, or of this court, because "the said barge is not a sea-going vessel, having no masts, bowsprit, sails, rudder, or any other propelling or directing power." The jurisdiction in the case does not depend upon the question whether the barge was a sea-going ship, with the power of self-propulsion,

and having the spars, tackle, apparel, and furniture deemed necessary for her complete equipment, but whether she was a vessel engaged in a maritime service upon navigable waters. The act of the legislature of New Jersey, which gives the lien in the case was passed to aid in the collection of demands against ships, steamboats, or other vessels. It is admitted that there is no authority in the state legislature to enlarge or regulate the jurisdiction of the admiralty courts; and although the local law establishes the lien, there is no jurisdiction to enforce it here, except in a maritime contract for a maritime service. But it is admitted by the respondent, that we have here a vessel, navigating the waters of New York Bay, and engaged in transporting coal, lumber, and other materials, from point to point, in the cities of New York and Jersey City. This is essentially a maritime service. Her repairs was a maritime contract, and jurisdiction is not to be refused, because the vessel is not a ship, with a self-directing power, and fully equipped for the navigation of the seas. The remark of Ch. J. Marshall, in Gibbons v. Ogden, 9 Wheat. [22 U. S.] 220, in reference to the laws of congress for the regulation of commerce, seems applicable here. To the objection that steamboats were not to be included within the privileges conferred upon vessels by a license, he said: "These laws do not look to the principle by which vessels are moved. That subject is left entirely to individual discretion; and in that vast and complex system of legislative enactment concerning it, which embraces everything which the legislature thought it necessary to notice, there is not, we believe, one word respecting the peculiar principle by which vessels are propelled through the water. * * * Every act, either prescribing duties or granting privileges, applies to every vessel, whether navigated by the instrumentality of wind or fire, of sails or machinery." Confusion on this point has, doubtless, arisen from the fact, that some of the district and circuit courts have held that canal boats, navigating the canals of the states, are not within the jurisdiction of the admiralty. But it must be observed that these decisions rested upon the doctrine of the supreme court, as announced in The Thomas Jefferson, 10 Wheat. [23 U. S.] 428, that the admiralty jurisdiction of the United States depended upon and was limited to the ebb and flow of the tide. That doctrine was overruled in The Genesee Chief, 12 How. [53 U. S.] 443, and, in all subsequent cases, navigability, not tide, has been considered the true test of admiralty and maritime jurisdiction. As an indication of the progress and growth on this subject, in the mind of a single judge, it may be remarked that the late Justice Nelson, in The Ann Arbor [Case No. 408],

after deciding the case upon its merits, added an obiter dictum, that he was inclined to think, that a canal boat, exclusively adapted to canal navigation, was not a ship or vessel, upon the North river, or other navigable waters, within the admiralty jurisdiction, subject to maritime liens in the admiralty, for breaches of contract for affreightment. Ten years afterwards, the same great judge, in delivering the opinion of the supreme court in The Eagle, 8 Wall. [75 U. S.] 21, not only adopted and extended the principle of The Genesee Chief, but quoted with approbation the ruling of Dr. Lushington in the case of The Diana (1 Lush. 539), that the admiralty jurisdiction of England extended to a collision on the Great Holland canal. Since navigability has been accepted as the limit of the admiralty jurisdiction, rather than the ebb and flow of the tide, is it going too far to say, that a canal boat, navigating the waters of the Delaware and Raritan canal, is as much within the jurisdiction of the admiralty, as the white-winged ship, "that most perfect and wonderful production of human art," which circumnavigates the globe, and exchanges the products of all climes?

Mr. Benedict, in the last edition of his learned work on the American Admiralty (section 217), observes, that "questions have sometimes arisen, how far size, capacity, purpose and mode of propulsion, must enter into the definition of a ship or vessel, under the maritime law, and cases are found in the books, in which ships or vessels are denied that character, because their size was small, compared with the more capacious constructions of modern times, and because they were employed in the humble occupations of agricultural or agrestic commerce. But to those structures can hardly be denied the character of ships and vessels, which, in every particular, are superior to the ships and vessels of those countries, and periods, in which the great codes of maritime law were promulgated and enforced: nor can it make any difference, whether the vessel is propelled by the wind, the tide, or paddles: by steam, by animals, or by the human arm, or towed by another vessel;" and in section 218, that "a scow, a lighter, a ferry boat and probably a raft or timber ship, under certain circumstances, would be held to be a ship or vessel, and subject to the same maritime law as other vessels. It is not the form, the construction, the rig, the equipment or the means of propulsion, that establishes the jurisdiction, but the purpose and business of the craft, as an instrument of naval transportation." Accepting this as a correct statement of the law, at the present time, it must be held, that the admiralty jurisdiction of the court extends to the barge in controversy, and it is ordered accordingly.